IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: A BLACK SAMSUNG SMARTPHONE WITH IMEI NUMBER 356677534594713 | Case No. 25-mj-08044-ADM |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Clint Hawkins, Senior Special Agent with the Kansas Bureau of Investigation (KBI) and Task Force Officer (TFO) for the United States Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), being of legal age, having first been sworn upon my oath, state and depose as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application, under Federal Rule of Criminal Procedure 41, for a search warrant authorizing the examination an electronic device, described in Attachment A, which is currently in law enforcement's possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I, Clint Hawkins, am a full-time state certified law enforcement officer with the Kanas Bureau of Investigation (KBI).  I have been employed at the KBI since 2006 and have been assigned to both Field Investigations Division and Special Operations Division.  Currently, I serve as a Task Force Officer (TFO) at the Homeland Security Investigations (HSI).  I was assigned to this position in July 2023 and completed the TFO in-service in February 2024.  My duties as a KBI TFO to HSI include drug, financial fraud, and money laundering investigations.

3.      Prior to working at the KBI, I was employed by the United States Secret Service from 2003-2005, where many of my investigations involved fraud and counterfeit United States

1

currency.  I have received my law enforcement certification from the Federal Law Enforcement

Training Center (FLETC) with a reciprocity course completed at the Kansas Law Enforcement

Training Center (KLETC).

      4.      During the course of my law enforcement career, I have received numerous

trainings in criminal investigations, including but not limited to person crimes, illegal narcotics

investigations, child crimes, tactical training (SWAT), active shooter, first-line supervision, fraud

crimes, and more.  I have also completed the training for and become a Certified Fraud Examiner

and an Association of Certified Anti Money Laundering Specialists.  I have been a police

instructor on several disciplines such as firearms instructor and fraud examinations.  I, by way of

casework, have been a part of many criminal investigation types where I have written cell phone

search warrants.  During the course of these investigations, I have reviewed the portable case

files produced from cell phone forensic searches providing the contents of cell phones in case

types involving illegal narcotics, Child Sexual Abuse Material (CSAM), homicides, theft, and

weapons.

      5.      I received my Bachelor of Science in Spanish, with a minor in Portuguese, at the

United States Military Academy, West Point, New York.

      6.      The facts set forth in this affidavit are based on my personal knowledge,

information obtained during my participation in this investigation, information from other law

enforcement officers, my review of documents and computer records related to this investigation,

and information gained through my training and experience.  This affidavit is intended to merely

show that there is probable cause for the requested warrant and does not set forth all of my

knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.      The property to be searched is a black Samsung smartphone (originally housed in a black case), with IMEI number 356677534594713, and serial number R9TX70JH8FZ (written on a white sticker affixed to the back of the phone) (hereinafter referred to as the "**Target Device**"). The **Target Device** is currently secured in an evidence locker at KBI Headquarters, 1620 SW Tyler Street, Topeka, Kansas.

8.      The applied-for warrant would authorize the forensic examination of the **Target Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

9.      Based on my training, experience, conversations with other law enforcement officers, and the facts set forth in this affidavit, there is probable cause established that violations of 21 U.S.C. § 841(a)(1) (possession and distribution of a controlled substance) and 21 U.S.C. § 846 (conspiracy to distribute controlled substances) (the "Target Offenses") have been committed by **Carlos DEL TORO-MEDINA**.  As such, there is probable cause to search the **Target Device**, described in Attachment A, for evidence, contraband, fruits, and instrumentalities of these crimes, as described in Attachment B.  At the time of this search warrant application, the Target Device is located in the District of Kansas.

## FACTS ESTABLISHING PROBABLE CAUSE

10.      Beginning on or about March 11, 2025, a Kansas Bureau of Investigation (KBI) confidential informant (CI) was in contact with Tadeo Medrano (hereinafter referred to as T. MEDRANO) regarding the purchase of approximately ten kilograms of methamphetamine in exchange for $3,500 per kilogram.  KBI's CI has been proven reliable, based on information that was independently corroborated by investigators, and is working for monetary value.  T.

3

MEDRANO advised that the courier (who delivered a kilogram of methamphetamine the month prior to investigators) would be the same individual delivering the drugs on March 14, 2025. Investigators later identified this courier as CARLOS ALBERTO DEL TORO-MEDINA. During the evening on March 13, 2025, T. MEDRANO informed the KBI CI that he (T. MEDRANO) would contact the KBI CI at 11:00 a.m. the following day (March 14, 2025) and provide the transaction location.

11.     On March 14, 2025, at approximately 12:00 p.m., T. MEDRANO contacted the KBI UC and requested to meet in the parking lot at 7800 Shawnee Mission Parkway, Overland Park, Kansas. Investigators initiated surveillance on the proposed deal location at approximately 12:32 p.m. Shortly after, investigators observed a white Chevrolet Equinox, driven by an unknown individual, meet with a black Mitsubishi Outlander, bearing Kansas temporary tag D851892. Investigators observed the white Equinox's sole occupant, a male driver, place what appeared to be a duffle bag in the Mitsubishi Outlander. At approximately 12:44 p.m., the KBI CI and KBI Undercover Agent KBIUCA-295 (UCA) arrived at the meet location and contacted the occupants of the black Mitsubishi Outlander. The Outlander was occupied by a male Hispanic driver (later positively identified as CARLOS ALBERTO DEL TORO-MEDINA) and a male Hispanic front seat passenger (later positively identified as CHRISTOPHER CHAIREZ). The UCA, present with the KBI CI, made visual confirmation of methamphetamine inside of the Mitsubishi Outlander after DEL TORO-MEDINA and CHAIREZ opened the duffel bag. Shortly after the UCA observed the methamphetamine, CHAIREZ said they (referring to CHAIREZ and DEL TORO-MEDINA) had to go. The Mitsubishi Outlander then abruptly left the parking lot.

12.     Kansas Highway Patrol (KHP) Trooper Scott Walker then attempted to conduct a traffic stop on the Mitsubishi Outlander at 7700 Shawnee Mission Parkway, east of the meeting

location in Overland Park, Kansas. At that time, the Outlander failed to yield and a pursuit, lasting approximately five minutes, ensued. During the pursuit, at 60th Street and Nall Avenue, Trooper Walker observed the passenger, CHAIREZ, throw a duffle bag out of the Outlander's front passenger side window. As the Mitsubishi Outlander entered the northbound I-35 entrance ramp from Roe Boulevard, Trooper Walker conducted a tactical vehicle intervention (TVI) maneuver on the Mitsubishi Outlander, which brought the pursuit to an end. KHP troopers took the Outlander's driver (DEL TORO-MEDINA) and front passenger (CHAIREZ) into custody. Troopers researched the Mitsubishi Outlander's vehicle information following the crash. A search through the National Criminal Information Center (NCIC) revealed the vehicle was stolen.

13.    During the pursuit, investigators retrieved the duffle bag near the intersection of 60th Street and Nall Avenue, within the District of Kansas. Within the duffle bag, investigators located ten plastic bags (each containing a white crystalline substance), which appeared to be consistent with crystal methamphetamine. Investigators secured and transported the evidence for processing. Investigators subsequently utilized a TruNarc field test device to test the plastic bags' contents. The field test confirmed the presence of methamphetamine. The plastic bags, containing the methamphetamine, weighed approximately 22 pounds (approximately 9.979 kilograms).

14.    CHAIREZ waived his *Miranda* Rights and agreed to speak with investigators following his arrest. CHAIREZ said he currently resides in Kansas City, Missouri and is a United States citizen. CHAIREZ said he received a phone call, approximately 2-3 days ago, from "Frankie," whom he later identified as TADEO MEDRANO after investigators showed CHAIREZ a photograph of TADEO FRANCISCO MEDRANO. CHAIREZ said T. MEDRANO requested CHAIREZ contact his (CHAIREZ's) Mexico methamphetamine supply source to obtain 10 kilograms for T. MEDRANO in Kansas. CHAIREZ brokered the methamphetamine transaction

5

with the Mexican supply source and agreed to meet with DEL TORO-MEDINA on March 14, 2025, to conduct the deal. At approximately 11:30 a.m., DEL TORO-MEDINA picked up CHAIREZ from his (CHAIREZ's) residence and drove CHAIREZ to the deal location. Once there, CHAIREZ collected the duffle bag from the Chevrolet Equinox and held onto it. CHAIREZ told DEL TORO-MEDINA they needed to leave and instructed DEL TORO-MEDINA to depart the deal location without conducting the transaction. During the pursuit, CHAIREZ used his familiarity with the area to direct DEL TORO-MEDINA where to drive, in hopes of evading apprehension. CHAIREZ admitted to throwing the duffle bag containing the methamphetamine, out of the Mitsubishi Outlander's front passenger side window.

15.     DEL TORO-MEDINA waived his *Miranda* rights and agreed to speak with investigators after his arrest. Investigators showed TADEO MADRENO's photograph to DEL TORO-MEDINA and DEL TORO-MEDINA identified T. MADRENO as "Francisco." DEL TORO-MEDINA said T. MEDRANO is the individual who had contacted him regarding the methamphetamine drug transaction that took place today.

16.     During separate interviews, investigators showed CHAIREZ and DEL TORO-MEDINA the same photograph of T. MEDRANO. Both CHAIREZ and DEL TORO-MEDINA identified T. MEDRANO as the orchestrator of the 10-kilogram methamphetamine transaction.

17.     During the interview, DEL TORO-MEDINA said he did not have contact numbers for drug dealers in his phone, but there were messages directing him to deliver drugs. DEL TORO-MEDINA said he received a message indicating where to meet another individual for the drug transaction. Prior to the crash, DEL TORO-MEDINA said his cellular phone was on a clip holder (similar to what a GPS unit would be on) above the Mitsubishi Outlander's center console. DEL TORO-MEDINA described his cellular telephone as a black Samsung cellular phone with three

6

cameras. DEL TORO-MEDINA said he used WhatsApp to talk on his cell phone and his phone number was (913) 420-9657.

18.     In the evening of March 14, 2025, KHP Trooper Scott Moses went to the Alandon Tow Service, 6224 Kansas Avenue, Kansas City, Kansas, where the Mitsubishi Outlander (involved in the crash) was maintained in a secure bay. Trooper Moses recovered and secured a black Samsung smartphone in a black case (the **Target Device**) from the driver's side floorboard. Trooper Moses returned the **Target Device** to KBI personnel at the Kansas City, Kansas Police Department, where it was secured for evidence.

19.     Based on my training, experience, and conversations with other law enforcement officers, I believe DEL TORO-MEDINA was trying to show cooperation while also distancing himself from drug trafficking. I further believe DEL TORO-MEDINA knew what was in the duffle bag, and what he was meeting with the UCA about prior to the pursuit and his arrest. I further believe he used the **Target Device** to contact T. MEDRANO about drug related offenses.

## TECHNICAL TERMS

20.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.     Cell phone: A cell phone (or mobile phone, or wireless phone) is a handheld wireless device used for voice and data communication through radio signals. These phones send signals through networks of transmitter/receivers, enabling communication with other wireless phones or traditional "land line" phones. A cell phone usually contains a "call log," which records the phone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless phones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic

"address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cell phones may also include global positioning system ("GPS") technology for determining the location of the device.

   b.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   c.    Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

   d.    GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been.

Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

g.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0–255, separated by periods (*e.g.*, 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

21.     Based on my training, experience, and research, I know the **Target Device** is a "smart phone" that serves as, but not limited to: a cell phone, a digital camera and video recorder, a portable media player, a GPS navigation device, a personal data assistant, and an internet explorer; and may also contain mobile applications, including social media applications, installed on the devices, that can be utilized to send voice, text, and multimedia messages.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the **Target**

**Device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Target Device** because:

      a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the device consistent with the warrants. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrants.

25. *Manner of execution.* Because these warrants seek only permission to examine the device already in law enforcement's possession, the execution of this warrant does not involve physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

26. *Specialized Examination and Location.* The **Target Device** described in Attachment A was seized in the District of Kansas. The examination of the **Target Device** will be conducted locally by a KBI agent familiar with digital media collection. However, in the event that obtaining the information described in Attachment B from the property described in Attachment A requires the use of a qualified computer expert in a laboratory or other controlled environment, I will utilize national HSI resources to conduct the forensic analysis described in this affidavit and in Attachment B.

27. Finally, the requested warrant would also authorize law enforcement officers to make and retain functional copies of the audio and video files stored on the **Target Device**, and to review those copies for evidence of crimes against the United States and the State of Kansas, in addition to those outlined within the scope of the warrants. If evidence of additional crimes outside the scope of the current warrants are discovered within the data copied from the **Target Device**, additional search warrants will then be sought seeking evidence of those crimes. The copied audio and video files will be the sole property of HSI, and thus may be shared with other federal and

state law enforcement officers and court officials to whom these videos may be of evidentiary value in past, current, and future investigations. Those copied audio and video files will be retained by the HSI until the conclusion of this investigation.

## CONCLUSION

28.    Based on the foregoing, I respectfully submit that there is probable cause to believe the **Target Device** presently contains or constitutes evidence of 21 U.S.C. §§ 841 and 846. I therefore request a warrant to search the **Target Device** described in Attachment A for the items set forth in Attachment B.

Respectfully submitted,

Special Agent Clint Hawkins
Kansas Bureau of Investigations
Homeland Security Investigations, TFO


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on March  24th , 2025.


HONORABLE ANGEL D. MITCHELL
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
## PROPERTY TO BE SEARCHED

The property to be searched is a black Samsung smartphone (originally housed in a black case), with IMEI number 356677534594713, and serial number R9TX70JH8FZ (written on a white sticker affixed to the back of the phone), seized on March 14, 2025, from the vehicle occupied by Carlos DEL TORO-MEDINA (the "Target Device"). The Target Device is currently located at KBI Headquarters, 1620 SW Tyler Street, Topeka, Kansas.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

 

**ATTACHMENT B**
**PARTICULAR ITEMS TO BE SEIZED**

All records, data, and information on the Target Device (described in the Affidavit and Attachment A) relating to violations of Title 21, United States Code, Sections 841(a)(1) and 846. After the initial imaging, the examiner and agents will not further save or copy data unrelated to these violations. To the extent possible, the examiner and agents will minimize the review of unrelated data. Probable cause exists to believe the information and items, listed herein, will be located in the referenced Target Devices, including:

a. Lists of customers and related identifying information;

b. Any information recording meetings, deliveries, the schedule and travel of the parties involved in drug trafficking;

c. All bank records, checks, credit card bills, account information, wire transfer and other financial records;

d. Records and documents related to residences utilized;

e. Contact information, incoming and outgoing call information, pictures, videos, stored voicemail and text messages;

f. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

g. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

h. Target Device ownership and user information, including evidence of user attribution showing who used or owned the particular Target Device at the time the things described in the warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

15

i. Records evidencing the Internet Protocol address, the use of said address and any records of other Internet Protocol addresses used;

j. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k. Photographs, images, and videos of drug trafficking activity, drug trafficking associates, instrumentalities or proceeds of drug trafficking; including stored information related to the date, time, user and owner of the device, and location of the image generation.

l. Any geotagging information such as the camera's date and time clock, make and model, serial number, and location of photographs and videos determined by the camera's Global Positioning System receiver or geotagging tool, including any identification information related to the use and ownership of the devices. This also includes cell tower information, GPS coordinates, and location services commonly used and stored by cell phones and their applications during normal use of the device(s).

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory, thumb drives, or other media that can store data) and any photographic form.